Marc J. Randazza (NV Bar No. 12265)
Ronald D. Green (NV Bar No. 7360)
Alex J. Shepard (NV Bar No. 13582)
RANDAZZA LEGAL GROUP, PLLC
2764 Lake Sahara Drive, Suite 109
Las Vegas, NV 89117
Telephone: 702-420-2001
ecf@randazza.com

Attorneys for Plaintiff
Sonya Duex

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

**SONYA Z. DUEX**, an individual;

      Plaintiff,

  vs.

**LAS VEGAS RESORT HOLDINGS, LLC** dba SAHARA LAS VEGAS, a Delaware limited liability company, and ROES I-X, inclusive,

      Defendants.

Case No.: _____

**COMPLAINT**

Plaintiff Sonya Z. Duex, by and through her counsel of record, hereby complains against Defendant Las Vegas Resort Holdings, LLC d/b/a Sahara Las Vegas ("Sahara") and ROES I-X, inclusive, ("Defendants") as follows:

## INTRODUCTION

1.      Ms. Duex is a woman.  She is also transgender.  While her assigned-sex, given at birth based on physical characteristics, is male, her gender identity is female and she identifies as a woman. It is medically necessary for her to undergo medically necessary genito-urinary surgery in order that her physical characteristics conform with and affirm her gender identity.

2.      Ms. Duex wants to be treated equally with biological female employees of Sahara who require medically necessary genito-urinary surgery.

3.      Sahara did not and does not want to treat her equally because she is biologically male.

4.      Federal law, state law, and human decency all seek to prevent sex-based discrimination.  Today, more than ever before we as a society have nearly unlimited access to news coverage detailing violations of human rights across the United States and the world.  We also have, now more than ever before, both a heightened awareness of transgender rights as human rights and an increased obligation to eliminate discriminatory practices and norms from our lives.  Transgender people have the right to be themselves.  When they are denied this right, they are often forced to undergo psychological, emotional, and physical distress.  Transgender rights are human rights. Healthcare is a human right that must be free of discrimination in order to function effectively.  For the United States to be credible in advancing human rights and combating discrimination on the international stage, it needs to also set an example at home.  The necessity of upholding the right to equal non-discriminatory healthcare for all transgender people has never been more pressing or important than it is today.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 & 42 U.S.C. § 2000e-5(f)(3) because it is an action under Title VII of the Civil Rights Act of 1964 (Pub. L. 88-352).  This Court has supplemental jurisdiction over the state law claim per 28 U.S.C. § 1367(a) as it arises from the same facts and transactions.

6.      This Court has personal jurisdiction over Defendants pursuant to Nev. Rev. Stat. § 14.065(1).  Defendants solicit, transact, and do business in the State of Nevada.  Additionally, Defendants' actions forming the basis of Plaintiff's claims were conducted in Clark County, Nevada.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) & (2) because Defendants reside in this District and a substantial part of the events or omissions giving rise to the claim occurred in this District, and pursuant to 42 U.S.C. § 2005e-5(f)(3) because the unlawful employment practices were committed in this district, Plaintiff's employment records are maintained and administered in this District, this is the judicial district where Plaintiff worked, and Sahara's principal office is in this District.

**PARTIES**

8.      Plaintiff, Sonya Z. Duex, is a citizen of the State of Nevada and a resident of Clark County, Nevada.

9.      Defendant, Las Vegas Resort Holdings, LLC, is and at all relevant times was a Delaware limited liability corporation doing business as "Sahara" with its principal place of business in Clark County, Nevada.

10.     Defendants Roes I-X are unknown individuals involved in Sahara's unlawful employment practices made subject of this litigation.  Upon their identification, this Complaint will be amended to name them.

11.     At all times relevant, Defendant controlled certain terms and conditions of Ms. Duex's employer-sponsored health insurance benefits.

**FACTS RELEVANT TO ALL CLAIMS**

12.     Sonya Duex is a 41-year-old transgender woman.

13.     At all relevant times, Ms. Duex was an employee of Sahara Las Vegas.

14.     As part of Ms. Duex's compensation for employment, she received employer-sponsored health insurance benefits.

15.     Ms. Duex was denied, by Sahara, coverage for medically necessary gender confirmation surgery in order that her physical characteristics conform with and affirm her gender identity (also referred to as "transition-related care").

16.     At all times relevant, Sahara controlled certain terms and conditions of Ms. Duex's employer-sponsored health insurance benefits.

**<u>Transgender Individuals and Gender Dysphoria</u>**

17.     "Assigned sex" is the label a child is given at birth based on medical indicators such as, sex chromosomes, reproductive organs, and external appearance of genitalia.  This is also referred to as birth sex, biological sex, or sex. Sex implies the biological aspect of maleness or femaleness.

18.     "Gender" refers to the psychological, social, and behavioral aspects of being male or female.  The concept of gender is based upon the attitudes, feelings, and behaviors a given culture associates with a person's biological sex.

19.     "Gender identity" is an individual's personal sense of self as male or female, or even both or neither.  An individual's gender identity can be the same as their assigned sex or it can differ.

20.     "Gender expression" is how an individual outwardly presents their gender.  This can be identified by things like clothing, hair style, body language, and one's chosen name and pronoun.

21.     "Transgender" is a term that refers to a range of people whose gender identity does not match their sex assigned at birth.

22.     "Gender affirmation" refers to an interpersonal process where an individual receives social recognition and support for their gender identity and expression.

23.     "Gender dysphoria" is the medical diagnosis for the feeling of discomfort or distress arising from a sense of incongruence about one's experienced gender identity and sex assigned at birth.

24.     Gender dysphoria is a serious, but treatable medical condition.  If left untreated, it can cause clinically significant distress or impairment in social, occupations, or other important areas of functioning.  The sense of unease can be so intense it can lead to diminished self-esteem, anxiety, depression, isolation, substance abuse, and suicide and severely damage an individual's life.

25.     The medical necessity of gender-affirming care for transgender people who have gender dysphoria is recognized by the American Medical Association, the American Psychiatric Association, the American Psychological Association, the American Counseling Association, the American Psychoanalytic Association, the American Academy of Child and Adolescent Psychiatry, the American Academy of Nursing, the American Academy of Pediatrics, the American Academy of Nursing, the American Academy of Pediatrics, and the World Professional Association of Transgender Health.

26.     Gender-confirmation surgery changes a person's sexual characteristics to better reflect their gender identity.  Surgeries can give relief from gender dysphoria, increase safety and comfort, and can improve one's life in many ways including eliminating the need to take hormone therapies.

27. "Vaginoplasty" is a surgical intervention to construct or reconstruct a vagina, which, in gender-confirmation surgery, may include penile removal or inversion, and removal of the testes.

28. Biological females may themselves require vaginoplasty to reconstruct a vagina due to cancer or injury.

**Sahara's Exclusion of Gender Affirming Care**

29. Sahara offers self-insured health insurance benefits to its employees.

30. Anthem Blue Cross Blue Shield ("Anthem) is the health insurance provider that administers Sahara's employer-sponsored health insurance benefits.

31. Sahara's employer-sponsored health insurance benefits includes vaginoplasty for biological females who require medically-necessary construction or reconstruction of a vagina.

32. Sahara's employer-sponsored health insurance benefits exclude vaginoplasty for biological males who require medically-necessary construction of a vagina.

**Medical Necessity of Denied Treatment**

33. At all relevant times herein, Ms. Duex was a Table Games Supervisor employed by Sahara.

34. Ms. Duex was employed by Sahara for five years.

35. Ms. Duex is a woman. She is also transgender. While her assigned-sex, given at birth based on physical characteristics, is male, her gender identity is female and she identifies as a woman.

36. It is medically necessary for Ms. Duex to undergo medically necessary vaginoplasty in order that her physical characteristics conform with and affirm her gender identity.

37. Ms. Duex began experiencing gender dysphoria at the age of 15. She did not know what it meant to be transgender. She did not understand why she felt uncomfortable in her own body. She felt different and did not understand what was different about her.

38. Ms. Duex always had a strong desire to express her female gender identity but feared the consequences of doing so due to the stigma and violence transgender people often face.

39.     Because of her gender dysphoria, Ms. Duex lost many experiences from her youth, including her first kiss and first date, that she should have experienced as a girl.  It is still difficult for Ms. Duex to not regret losing those experiences because she was not comfortable in her body sooner.

40.     The greatest cause of Ms. Duex's discomfort was fear.  She was afraid to tell anyone she was transgender because she was afraid of being disowned and rejected by her friends and family.

41.     In 2015, Ms. Duex began to see positive coverage regarding transgender people in the news and felt a sense of motivation and eagerness to move forward with her transition.

42.     On November 10, 2015, Ms. Duex began her employment as a part-time Table Games Dealer at the Sahara.

43.     Ms. Duex's gender affirmation began in 2016.

44.     In 2016, Ms. Duex began joining a transgender support group.  She felt comforted by the experiences of other transgender people that had healthy families, friends, careers, and hobbies.

45.     In 2016, Ms. Duex began undergoing electrolysis to have her facial hair removed.

46.     In June 2016, Ms. Duex came out as transgender to her mother, close friends, and other family members.

47.     In the year 2017, Ms. Duex lived what she felt was a double-life.  At work, she was known as a male and used her male name.  As soon as she came home, she was herself: a woman.

48.     Ms. Duex felt it was necessary to keep her gender identity a secret at work out of fear of losing her job.  This was a very scary and stressful period of time for her.

49.     Living a double-life was harmful to Ms. Duex's wellbeing.  She was burdened with the stress of keeping track of who knew her as a woman and who did not.  While she lived her life as a woman on the weekends, she spent Sunday evenings removing the nail polish from her nails, preparing to be a man at work the next day, and dreading going back to being someone she wasn't.

50.     In September 2017, Ms. Duex realized she could not live a double life any longer.

51.     In September 2018, Ms. Duex began outwardly expressing her female gender identity in all public spaces.  She has done so consistently ever since.

52.     In January 2018, Ms. Duex began hormone replacement therapy, taking estradiol (estragen) and spironolactone (a testosterone blocker), intending to have her hormone levels match her gender identity.

53.     Taking spironolactone caused Ms. Duex to feel a sense of mental fogginess, which hindered her daily life.  As a black jack table dealer overseeing six different games at a time at work, it became difficult for Ms. Duex to recall specifics details about her players that she could easily remember without trouble before.  Ms. Duex was still able to perform her job duties, but the side effects of hormone replacement therapy created some stress.

54.     In January 2018, Ms. Duex began speaking to management, human resources, and close friends at work to prepare for her official gender transition.

55.     In March 2018, to ensure her legal identity matched her gender identity, Ms. Duex received a court order officially changing her name to Sonya Zoe Duex.

56.     She then began the process of amending her legal name and gender marker on her government-issued identification cards, including her Social Security record, driver's license, and birth certificate and other official documents.

57.     In April 2018, she came out as transgender on Facebook and in other areas of her personal and social life.  In May 2018, Ms. Duex took a one-week vacation from work and when she returned, she was Sonya Duex, a female, full time.  This was Ms. Duex's official gender affirmation.

58.     Ms. Duex did not receive any negative feedback at work because of her gender transition.  She believes that this is because she was very well respected and liked at work at this time.

59.     Despite Ms. Duex's initially positive experience at work pertaining to her gender transition, the team members of the Human Resources Department that had been supportive had all left Sahara by the time Ms. Duex was met with difficulty in requesting coverage for her surgery.

60.     In October 2018, Ms. Duex began cervical electrolysis.  Ms. Duex paid for this treatment out of pocket because she had heard from others that it is rarely covered by employer-sponsored insurance and since she anticipated requesting coverage for her upcoming surgery, she did not want to ask for too much.

**Sahara's Denial of Medically Necessary Care to Ms. Duex**

61.     On January 2, 2019, Ms. Duex contacted Anthem to request a pre-authorization for Vaginoplasty surgery.

62.     In response, Ms. Duex was told by Anthem, apparently in error, that the surgery was covered by her health care policy and that she would need to prove that it was medically necessary in order to obtain pre-authorization.

63.     On January 11, 2019, she received a letter from Anthem stating that more time and information was needed before her request could be reviewed.

64.     Ms. Duex received a checklist from Anthem enumerating steps to take to have the surgery qualified as medically necessary.

65.     Ms. Duex followed the checklist, which was confirmed by a letter from her doctor. Ms. Duex relied on this checklist to schedule her surgery. This included booking flights, placing monetary deposits with her physician, booking hotels, and making family arrangements.

66.     In January 2019, Ms. Duex began seeing therapists to confirm that she was healthy enough to undergo her planned surgery.  At this time, Ms. Duex felt confident and certain about her gender identity.  Aside from the medical necessity and safeness of her surgery, she did not need to discuss her transition.  Though, Ms. Duex's therapist became a major source of support.

67.     After three months of evaluation, Jamie Gillette wrote the first of two therapist's letters that Anthem told Ms. Duex were required for authorization of her surgery.  This letter confirmed Ms. Duex's diagnosis of gender dysphoria and stated that she met all of the requirements put forth by her surgeon, the World Professional Association for Transgender Health ("WPATH"), and Anthem themselves.

68.     Ms. Duex continued seeing Ms. Gillette for the remainder of the year as she helped her cope with anxiety, depression, and working over sixty hours per week at two different jobs.

69.     On August 10, 2019 Ms. Duex received the second therapist's letter she thought was required by Anthem by her therapist Laura Deitsch.  Ms. Deitsch reaffirmed what Ms. Gillette had

stated in her letter, confirmed Ms. Duex's diagnosis, and stated that she met all WPATH requirements for the procedure.

70.     Nine months later, following an August 2019 request for benefits, Anthem shocked Ms. Duex in September 2019 with news that her surgery would not be covered due to a discriminatory exclusion in Sahara's policy.

71.     Ms. Duex appealed the denial on advice from Sahara's Human Resources Department.

72.     In September 2019, Ms. Duex visited Sahara's Human Resources Department and spoke in person about the time off she was planning on taking for her surgery.  Ms. Duex asked how and why her claim was being denied and was told that Anthem was responsible for the denial and that Sahara would contact Anthem to have the request approved.

73.     About one week later, Sahara contacted Ms. Duex and said, without any further explanation, that Anthem denied their claim and there was nothing they could do to help her.

74.     This news was both shocking and devastating to Ms. Duex.  Her surgery was only two months away.  She had just finished paying medical expenses in excess of $17,000 with the expectation that Anthem would reimburse her.

75.     From September 2019 through early 2020, Ms. Duex communicated with Colleen Rivera, who is an Employee Relations Manager of Sahara's Human Resources Department, and Cary Berner, Sahara's Vice President of Human Resources, regarding the denial of coverage and her appeals of the decision by Sahara, communicated through Anthem, to deny coverage.

76.     Ms. Duex even e-mailed Sahara's owner, Alex Meruelo, to step in and end the discriminatory conduct.  Mr. Meruelo ignored Ms. Duex's plea for assistance.

77.      In Anthem's denial letter, acting for Sahara, it stated that "You are insured by an employer who is self-insured and Anthem only processes claims and provides the provider networks."

78.     Three months later, on December 4, 2019, Anthem, for Sahara, informed Ms. Duex that her 15 claims over the previous 12 months for sessions with her therapists were mistakenly approved, further increasing the financial burden on Ms. Duex for no other reason than her gender.

79. Sahara's benefits would cover substantially similar medically necessary therapy for a woman who is biologically female, but not for a woman who is biologically male.

80. Ms. Duex has suffered significant depression from Sahara's discrimination, including suicidal ideation. Her mental health deteriorated due to loss of therapy coverage. She faces significant financial hardships, and her personal relationships have been strained.

81. Ms. Duex's depression and panic attacks began in January 2020. January 26' 2020 is the first severe panic attack documented Ms. Duex. She was ready to jump off of the balcony of her boyfriend's home and believes that she would have had her boyfriend not been there.

82. Ms. Duex felt betrayed and abandoned by her employer.

83. Ms. Duex enjoyed her job and was good at it. She consistently received promotions. On March 11, 2016, she was promoted to Full Time Dealer. On July 13, 2016, she was promoted to Dual-Rate Dealer. On October 23, 2018, she was promoted to Full Time Supervisor. Ms. Duex was a very strong employee and a candidate for a management position.

84. Sahara's unwillingness to even speak to Ms. Duex about her situation caused her to feel severe anxiety about whether she would have a job to return to the next day and whether her employer would retaliate against her based on her gender.

85. Ms. Duex has been diagnosed with Major Depressive Disorder and she was hospitalized in May 2020 due to suicidal ideation.

86. Ms. Duex's raising of discrimination concerns with Sahara were met with behavior.

87. In July 2020, Ms. Duex spoke with Sahara's Senior Human Resources Operations Manager Ashley Rogers in an "escalated" telephone call. Ms. Rogers demanded updated disability leave paperwork but refused and failed to remediate the discriminatory health insurance benefits coverage by Sahara.

88. As a proximate result of the discriminatory treatment and hostile environment, Ms. Duex reasonably feared Sahara would seek a pretext to engage in retaliatory termination of her employment.

89.     Thus, she tendered her resignation from Sahara on July 23, 2020, a constructive termination, to mitigate her damages and preserve her employability prospects.

**Exhaustion of Administrative Remedies**

90.     On February 23, 2020, Ms. Duex emailed a letter to Sahara's Vice President of Human Resources titled, "Discriminatory Insurance Exclusions, Actions, and Inaction Resulting in Substantial Damage to My Health".

91.     Sahara failed to modify its discriminatory employee benefits practices in response to the letter.

92.     On March 27, 2020, Ms. Duex filed a timely charge with the Nevada Equal Rights Commission and the Equal Employment Opportunity Commission ("EEOC") against Sahara claiming discrimination on the basis of sex from September 2019 through March 2020 and ongoing. *See* EEOC Charge No. 487-2020-01051, a copy of which is attached as Exhibit A.

93.     On October 2, 2020, the EEOC issued a Dismissal and Notice of Rights.  *See* Exhibit B.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
*Unlawful Discrimination on the Basis of Sex*
*in Violation of Title VII of the Civil Rights Act of 1964*

94.     Plaintiff Duex hereby incorporates the allegations of each of the preceding paragraphs as if set forth herein.

95.     Title VII of the Civil Rights Act of 1964 provides that employers may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … sex." 42 U.S.C. § 2000e-2(a)(1).

96.     Title VII's prohibition of discrimination based on sex covers discrimination against a homosexual or transgender person, as "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1741, 207 L. Ed. 2d 218 (2020).

97.    Sahara's employer-sponsored, self-insured healthcare plan provides benefits to biological females for vaginoplasty, but Sahara excludes such benefits to biological males for vaginoplasty.

98.    At all relevant times herein, Sahara and the Roe Defendants acted in concert to deny coverage of vaginoplasty to Plaintiff.

99.    Such disparate, discriminatory treatment between biological males and biological females constitutes unlawful sex discrimination under Title VII.

100.    The denial of healthcare plan benefits for "sexual transformations" has a disparate impact on transgender employees on the basis of sex.

101.    As a proximate result of Defendant's violations of Title VII, Plaintiff suffered damages.

102.    Such damages include, but are not limited to, loss of income, loss of employment, emotional distress, including depression and suicidal ideation, and attorneys' fees and costs.

### SECOND CLAIM FOR RELIEF
### *Unlawful Discrimination on the Basis of Sex*
### *in Violation of NRS 613.330*

103.    Plaintiff Duex hereby incorporates the allegations of each of the preceding paragraphs as if set forth herein.

104.    NRS 613.330 provides that "it is an unlawful employment practice for an employer….to discriminate against any person with respect to the person's compensation, terms, conditions or privileges of employment, because of his or her…sex [or] gender identity or expression[.]" NRS 613.330(1)(a).

105.    NRS 613.330's prohibition of discrimination based on sex  and gender identity or expression covers discrimination against a homosexual or transgender person, as "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1741, 207 L. Ed. 2d 218 (2020).

106.     Sahara's employer-sponsored, self-insured healthcare plan provides benefits to biological females for vaginoplasty, but Sahara excludes such benefits to biological males for vaginoplasty.

107.     At all relevant times herein, Sahara and the Roe Defendants acted in concert to deny coverage of vaginoplasty to Plaintiff.

108.     Such disparate, discriminatory treatment between biological males and biological females constitutes unlawful sex and gender identity or expression discrimination under NRS 613.330.

109.     The denial of healthcare plan benefits for "sexual transformations" has a disparate impact on transgender employees on the basis of sex and gender identity or expression.

110.     As a proximate result of Defendant's violations of NRS 613.330, Plaintiff suffered damages.

111.     Such damages include, but are not limited to, loss of income, loss of employment, emotional distress, including depression and suicidal ideation, and attorneys' fees and costs.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, Plaintiff hereby demands trial by jury on all claims and defenses raised by any party to this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

A.     An award of general, exemplary, and punitive damages to Plaintiff in an amount to be determined at trial;

B.     An award of compensatory damages, including lost income, expenses related to vaginoplasty and transition related services, and emotional distress;

C.     Injunctive relief enjoining Sahara from further discriminating against transgender persons, including Plaintiff;

D.     Injunctive relief compelling Sahara to provide coverage for transition related services, including vaginoplasty, and any and all medically-necessary related treatment;

E.    An award of interest, costs, and attorneys' fees incurred by Plaintiff in prosecuting this action; and

F.    All other relief to which Plaintiff is entitled.

Dated: November 12, 2020.          Respectfully submitted,

/s/ Marc J. Randazza
Marc J. Randazza (NV Bar No. 12265)
Ronald D. Green (NV Bar No. 7360)
Alex J. Shepard (NV Bar No. 13582)
RANDAZZA LEGAL GROUP, PLLC
2764 Lake Sahara Drive, Suite 109
Las Vegas, NV 89117

Attorneys for Plaintiff
Sonya Duex

RANDAZZA | LEGAL GROUP